### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

### CASE NO. 20-82156-CIV-CANNON/Reinhart

**RICHARD JOHN LUCIBELLA**,

      Plaintiff,

v.

**RICHARD ERMERI** and
**NUBIA PLESNIK**,

      Defendants.

_____/

### <u>ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

**THIS CAUSE** comes before the Court upon Defendants' Motion for Summary Judgment ("Defendants' Motion") [ECF No. 102].  Subsequent to Defendants' Motion, the parties jointly filed a Stipulation [ECF No. 152], dismissing the battery claim against Officers Ermeri and Plesnik (Count I).  Following that Stipulation [ECF No. 152], only Counts II and III remain.   The Court has reviewed Defendants' Motion, Plaintiff's Amended Response in Opposition [ECF No. 139], Defendants' Reply [ECF No. 147], and the full record [ECF Nos. 110, 121, 140, 146].  Upon careful review, Defendants' Motion for Summary Judgment [ECF No. 102] is **DENIED**.

### FACTUAL BACKGROUND

This case involves various alleged civil rights violations arising out of a police encounter, altercation, and resulting arrest that occurred at Plaintiff's property on his back patio in Ocean Ridge, Florida.  Except where otherwise noted, the following facts are undisputed.[1]

_____

[1] These facts are drawn from Defendants' Statement of Material Facts [ECF No. 110], Plaintiff's Opposition Statement of Material Facts [ECF No. 140], Defendants' Reply Statement of Facts [ECF No. 146], and supporting exhibits.

On October 22, 2016, Plaintiff Richard Lucibella and Steven Wohlfiel, a Lieutenant for the Ocean Ridge Police Department, who was off duty at the time, met at Plaintiff's house to socialize [ECF No. 110 ¶ 1]. Lucibella and Wohlfiel took a golf cart to attend a dinner/cocktail party at a neighbor's house before returning to Plaintiff's back patio and each getting an additional drink [ECF No. 110 ¶¶ 2–3; ECF No. 140 ¶¶ 2–3]. While sitting and discussing "family issues," Wohlfiel suddenly drew and fired his handgun into the ground about ten to twelve feet in front of him, in what he described as an "act of stupidity" [ECF No. 110 ¶ 4; ECF No. 140 ¶ 4].

**Officers Respond to 911 Calls Reporting Gunshots**

As a result of the gunshots, the Ocean Ridge Police Department received multiple 911 calls around 9 p.m. [ECF No. 101-7 p. 15:8–15; *see* ECF No. 101-7 p. 14]. The emergency calls were unusual because Ocean Ridge is generally a safe and quiet community [ECF No. 121 ¶ 2]. Within minutes, Officer Ermeri, an Ocean Ridge Police Department officer, responded to the 911 report of gunshots heard in the general vicinity of Plaintiff's home [ECF No. 121 ¶ 1; ECF No. 101-7 p. 15:11–13; *see* ECF No. 101-11; ECF No. 101-12]. Officer Ermeri was not aware of the origin of the gun shots when he arrived [ECF No. 101-7 p. 17:15–21]. Officer Ermeri was the first of three officers who responded to the area following the 911 calls [ECF No. 121 ¶¶ 3–4]. When Officer Ermeri arrived in the area, he turned from Adams Road onto Old Ocean Boulevard and encountered a group of people out walking [ECF No. 101-7 pp 15:19–16:7]. Officer Ermeri spoke with those bystanders, including Sheri and Mark Feinstein, who indicated that they heard the gunshots and pointed out where they believed the gunshots originated [ECF No. 110 ¶ 16; ECF No. 101-7 pp. 16:15–23; ECF No. 101-11; ECF No. 101-12]. Specifically, Sheri and Mark Feinstein were pointing south and west toward Plaintiff's home at 5 Beachway Drive and indicating that the shots either originated from that house or one of the houses on either side

CASE NO. 20-82156-CIV-CANNON/Reinhart

[ECF No. 110 ¶ 16; ECF No. 101-7 pp. 16:15–23; ECF No. 101-11; ECF No. 101-12].

### Officer Ermeri Investigates in the Neighborhood

Officer Ermeri first investigated the house adjacent to Plaintiff's house at 1 Beachway Drive and observed that the situation there appeared normal [ECF No. 101-7 pp. 17:23–18:3 ("I'm familiar with the doctor there. Uhm, I seen him through his window washing dishes in the kitchen; it appeared as if everything was okay there.")]. Officer Ermeri then approached Plaintiff's home from the Old Ocean Boulevard side of the home [ECF No. 121 ¶ 6]. Plaintiff's backyard is surrounded by a wall with a gate [ECF No. 121 ¶ 7]. Looking through the wrought iron gate, Officer Ermeri could see two individuals including Plaintiff [ECF No. 121 ¶ 6]. Officer Ermeri recognized Plaintiff from prior friendly interactions and knew that Plaintiff was the Town Commissioner and Vice Mayor [ECF No. 121 ¶ 6]. Although Officer Ermeri knew Wohlfiel as a superior officer with the Ocean Ridge Police Department, Officer Emeri did not initially recognize the other individual as Wohlfiel [ECF No. 121 ¶ 6, 11–12; ECF No. 101-7 p. 25:17–18]. Officer Ermeri asked if they heard any gunfire, and Wohlfiel responded, "get the fuck out of here" [ECF No. 121 ¶ 9].

### Officer Ermeri Enters Plaintiff's Backyard

A few minutes later (the exact span of time is not clear), Officer Ermeri entered Plaintiff's backyard through the closed gate without a warrant and without invitation or permission [ECF No. 121 ¶ 10; ECF No. 101-7 pp. 85:23–86:24]. At some point near the time that Officer Ermeri entered the backyard, he saw a gun in Plaintiff's possession [ECF No. 110 ¶ 20; ECF No 140 ¶ 20; ECF No. 101-7 p. 86:7–8 ("[I]t was within a close temporal relationship . . . as I'm approaching and walking through the gate.")]. However, the parties dispute whether Officer Emeri saw the gun before or after he entered the backyard [ECF No. 110 ¶ 20; ECF No 140 ¶ 20].

CASE NO. 20-82156-CIV-CANNON/Reinhart

Officer Emeri's trial testimony and deposition testimony, read in combination, provide an unclear picture as to the precise moment Officer Ermeri spotted the gun.  In his deposition, Officer Ermeri testified that he was still on the outside of the fence when he saw the gun [ECF No. 101-10 p. 12:14–17 ("[T]hat's when I seen Lucibella with a gun. Q. And did you see that when you were still on the outside of the fence? A. I was.")].  Likewise, Officer Ermeri averred in a declaration that, "[o]n the night of October 22, 2016, the lighting of the rear patio area of the home at 5 Beachway North in Ocean Ridge, Florida was sufficient for me to see, from outside that property, Plaintiff Richard Lucibella handling a handgun while in the patio area" [ECF No. 145-1 ¶ 3].  Nevertheless, Officer Ermeri testified during Plaintiff's state court criminal trial that he was not sure whether he spotted the gun before or after he entered Plaintiff's backyard [ECF No. 101-7 pp. 27:9–13, 84:23–85:4, 87:9–13 ("[I]f you're looking for a landmark where I noticed the gun, I would have said well I noticed it at the gate either a foot and half away or possibly a foot and a half through.")].

After entering the backyard and approaching closer, Officer Ermeri noticed shell casings on the ground and eventually found a total of five casings [ECF No. 101-10 pp. 10:6–7, 13:4–5, 23:11–23].  Officer Ermeri also noticed Plaintiff attempt to conceal the gun by sitting on it [ECF No. 110 ¶ 20; ECF No. 140 ¶ 20; ECF No. 101-10 p. 13:6–9].  As Officer Ermeri got closer, he also noticed that the second individual was Wohlfiel, his superior officer [ECF No. 101-10 p. 13:23–25 ("I approached both Lucibella and the other gentleman.  The closer I got I realized the other gentleman was my Lieutenant Wohlfiel.")].

### The Other Officers Arrive

Two other Ocean Ridge Police Department officers also responded to the 911 calls:

Officers Nubia Savino[2] and William Hallahan [ECF No. 121 ¶ 15].  Officer Ermeri called Officer Hallahan to come to the scene over the radio, indicating Officer Ermeri had located the weapon [ECF No. 121 ¶ 13].  Officer Ermeri asked Plaintiff about the gun, after which Officer Ermeri took possession of the gun without incident or delay [ECF No. 121 ¶ 14].  Shortly after Plaintiff gave the gun to Officer Ermeri, Officers Savino and Hallahan arrived at Plaintiff's backyard [ECF No. 101-9 p. 60:7–12; ECF No. 121 ¶ 15].  Officer Hallahan informed Plaintiff and Wohlfiel that the on-duty officers were investigating an emergency call reporting gunshots [ECF No. 110 ¶ 23; ECF No. 140 ¶ 23].  Officer Hallahan further noted that the gun Officer Ermeri recovered from Plaintiff appeared to have been fired [ECF No. 110 ¶ 23; ECF No. 140 ¶ 23].  Plaintiff did not respond, and Wohlfiel stated "we don't have to say anything" [ECF No. 110 ¶ 23; ECF No. 140 ¶ 23].  Officer Hallahan then stepped away from the scene to speak with the Police Chief by telephone [ECF No. 110 ¶ 24; ECF No. 140 ¶ 24].

Prior to stepping away to call the Police Chief, Officer Hallahan told Plaintiff that he could not go into the house until the Officers had completed their investigation [ECF No. 110 ¶ 29; ECF No. 140 ¶ 29; ECF No. 101-13 p. 42 ("I believe I said 'my rule is nobody goes into the house.")].  Office Ermeri stepped between Plaintiff and the door, barring him from entering the house to get another drink [ECF No. 110 ¶ 31; ECF No. 140 ¶ 31].  Plaintiff then requested a drink from Barbara Ceuleers, Plaintiff's significant other, who was in the doorway of the house [ECF No. 101-9 p. 69:17–19; ECF No. 110 ¶ 31].  When Ceuleers returned with the drink, Officer Ermeri told Plaintiff that he could not have the drink [ECF No. 110 ¶ 31; ECF No. 140 ¶ 31].  Plaintiff attempted to take the drink anyway, however, at which point a physical altercation

---

[2]  Officer Savino was known as Officer Nubia Plesnik at the time of the incident [ECF No. 123-4 p. 6:3–6].  The names Savino and Plesnik are used interchangeably throughout the record.

CASE NO. 20-82156-CIV-CANNON/Reinhart

between Plaintiff and Officer Ermeri ensued [ECF No. 110 ¶ 33; ECF No. 140 ¶ 33].

### The Incident

The parties' accounts of the scuffle differ.

According to Officer Ermeri, Plaintiff aggressively "attempted to walk through [Ermeri]" [ECF No. 101-7 pp. 48:13–21, 217:16–17]. Officer Ermeri extended both of his arms and put his hands up to signal Plaintiff to stop advancing [ECF No. 101-7 pp. 48:17–49:12]. Plaintiff then walked into Officer Ermeri's extended hands and forcefully poked Officer Ermeri several times in the chest [ECF No. 101-7 pp. 49:13–50:3, 218:16–19]. At the same time, Plaintiff said "[t]ake your F-ing hands off me" [ECF No. 101-8 p. 98:2]. Officer Ermeri also testified that Plaintiff told him, "I'll blind you, you're done" [ECF No. 101-7 p. 239:15–16]. Officer Ermeri tried to turn Plaintiff around to place Plaintiff in hand restraints, but Plaintiff grabbed Officer Ermeri behind his head, preventing Officer Ermeri from separating himself from Plaintiff [ECF No. 101-7 p. 50:4–11]. Officer Ermeri then released his "pushing force and turned it into a pulling force" while at the same time "attempt[ing] to sweep one of [Plaintiff's] legs" with his right foot and, ultimately, was able to use Plaintiff's momentum to "direct him down to the ground [ECF No. 101-7 pp. 50:19–51:1].

According to Plaintiff, when Ceuleers came out with the drink, he reached for it [ECF No. 123-1 p. 216:10–11]. Officer Ermeri then "inserted himself into [Plaintiff's] space" and pushed with both hands into Plaintiff's chest, shoving him back [ECF No. 123-1 p. 216:11–13]. Plaintiff testified that the shove pushed him a half step back, and that Officer Emeri "advanced with [him]" [ECF No. 123-1 p. 216:11–19]. In response to the shove, Plaintiff testified that he "reflexively poked" Officer Ermeri in his bulletproof vest "two or three times" [ECF No. 123-1 pp. 217:20–21, 218:6–10, 219:3–9]. At that point, according to Plaintiff, Officer Emeri paused

and seemed unsure what to do next [ECF No. 123-1 p. 217:21–23].  Plaintiff testified that he

reached out again to take the drink without any physical contact with Officer Ermeri

[ECF No. 123-1 p. 217:23–25].  According to Plaintiff, Officer Ermeri then grabbed him by his

left hand and twisted it [ECF No. 123-1 pp. 217:25–218:1].  Wohlfiel testified that Officer Ermeri

took Plaintiff down using what he described as a "failed leg sweep" [ECF No. 101-9 p. 75:4].

Wohlfiel noted that a properly performed leg sweep would cause the individual to land with their

back facing the ground but that in this case, it caused Plaintiff to go down on the marble floor face

first [ECF No. 101-9 p. 75:13–19].

Once Plaintiff was on the ground, Officer Ermeri testified that Plaintiff was resisting and

was "belligerent and uncooperative" but that, with the assistance of Officer Plesnik, Officer Ermeri

handcuffed Plaintiff on the ground [ECF No. 101-10 p. 20:19–24; ECF No. 101-7 p. 53:1].  In the

course of securing Plaintiff in handcuffs, Officer Plesnik put her knee on Plaintiff's back to "lock

him to the floor" [ECF No. 123-4 p. 64:11–21].  Officer Plesnik testified that she did not think that

she put her full weight on his back [ECF No. 123-4 p. 64:24–65:2].  Plaintiff disputes this

[ECF No. 140 ¶ 39], pointing to Wohlfiel's testimony that, in his opinion, Plesnik's assistance and

technique, which Wohlfiel characterized as a "knee drop," was unnecessary "because at that point

Mr. Lucibella was not moving" [ECF No. 101-9 p. 84:11–21].  Wohlfiel testified that, although

Plesnik did not jump onto Plaintiff, she did immediately discontinue suspending her own weight

and transferred her full weight onto Plaintiff's back through her knee [ECF No. 101-9 p. 85:6–13

("Q. Did it seem like she lowered herself down gradually at all? A. No.");

ECF No. 123-3 p. 127:20–24].

After he was handcuffed, Officer Plesnik escorted Plaintiff to a patrol vehicle to be

transported to the Ocean Ridge Police Department [ECF No. 121 ¶ 21].  Plaintiff sustained injuries

to his face, including a laceration above his eyebrow [ECF No. 121 ¶ 19; ECF No. 123-8].  Plaintiff also claims that he fractured three of his ribs [ECF No. 123-7].

## State Criminal Proceeding

The State Attorney charged Plaintiff with (1) battery on a law enforcement officer (felony), (2) resisting arrest with violence (felony), and (3) using a firearm while under the influence of alcoholic beverage (misdemeanor) [ECF No. 121 ¶ 22; ECF No. 101-3].   On the first day of the criminal trial, which took place in January 2019, the prosecutor dismissed the charge for using a firearm while under the influence of alcoholic beverage [ECF No. 121 ¶ 23].   The jury then returned a verdict of not guilty on all remaining charges tried to the jury, which were (1) battery on a law enforcement officer and (2) resisting arrest with violence, but guilty of the lesser-included offense of simple battery [ECF No. 121 ¶ 24].   On February 21, 2019, the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida, adjudicated Plaintiff guilty of misdemeanor battery upon Officer Ermeri [ECF No. 121 ¶ 25].  Florida's Fourth District Court of Appeal affirmed Plaintiff's conviction [ECF No. 121 ¶ 25].

## PROCEDURAL HISTORY

On October 20, 2020, Lucibella filed a complaint in state court consisting of nine counts against Officer Ermeri, Officer Plesnik, and the Town of Ocean Ridge ("the Town") [ECF No. 1-2].  On November 24, 2020, the Town removed the case to federal court [ECF No. 1]. After Defendants moved to dismiss the complaint [ECF No. 15], Plaintiff filed the operative Amended Complaint on December 21, 2020 [ECF No. 21].

Plaintiff's Amended Complaint alleges nine counts against Defendants [ECF No. 21].  The breakdown of claims is as follows:

- Count I: battery against Officers Ermeri and Plesnik;

CASE NO. 20-82156-CIV-CANNON/Reinhart

- <u>Count II</u>: 42 U.S.C. § 1983 excessive force against Officers Ermeri and Plesnik;

- <u>Count III</u>: false arrest or imprisonment against Officers Ermeri and Plesnik;

- <u>Count IV</u>: 42 U.S.C. § 1983 false arrest/false imprisonment against Officers Ermeri and Plesnik;

- <u>Count V</u>: malicious prosecution based upon actual malice against Officers Ermeri and Plesnik;

- <u>Count VI</u>: 42 U.S.C. § 1983 malicious prosecution/continuing seizure against Officers Ermeri and Plesnik;

- <u>Count VII</u>: 42 U.S.C. § 1983 unreasonable search against Officers Ermeri and Plesnik;

- <u>Count VIII</u>: 42 U.S.C. § 1983 malicious prosecution/continuing seizure against the Town; and

- <u>Count IX</u>: 42 U.S.C. § 1983 excessive force against the Town.

Defendants filed a motion to dismiss Counts III through IX [ECF No. 24 p. 3]. The Court granted in part and denied in part that motion on November 23, 2021 [ECF No. 89], dismissing Counts III through IV and VIII and IX with prejudice. On March 11, 2022, the parties jointly filed a Stipulation dismissing the battery claim against Officers Ermeri and Plesnik (Count I) [ECF No. 152]. Following that Order and Stipulation [ECF Nos. 89 and 152], the remaining claims are excessive force against Officers Ermeri and Plesnik (Count II) and unreasonable search in violation of the Fourth Amendment against Officers Ermeri and Plesnik (Count VII) [ECF No. 21 pp. 7–8, 15–16]. Plaintiff seeks compensatory damages, costs, and attorney fees, as well as punitive damages on the excessive force claim [ECF No. 21 pp. 8, 16].

On December 29, 2021, Defendants filed the instant Motion for Summary Judgment [ECF No. 102]. The Motion is ripe for adjudication [ECF Nos. 102, 139, 147].

CASE NO. 20-82156-CIV-CANNON/Reinhart

## LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party.  *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).  The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252.

"For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (internal quotation marks omitted). Speculation or conjecture cannot create a genuine issue of material fact.  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  The moving party has the initial burden of showing the absence of a genuine issue as to any material fact.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  In assessing whether the moving party has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party.  *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).  Once the

CASE NO. 20-82156-CIV-CANNON/Reinhart

moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); Fed. R. Civ. P. 56(e).

## DISCUSSION

Defendants move for summary judgment on the basis of qualified immunity as to Plaintiff's claims of illegal search in violation of the Fourth Amendment (Count VII) and excessive force (Count II) [ECF No. 102 pp. 9–19]. Defendants alternatively seek dismissal of Plaintiff's illegal search claim (Count VII), arguing that because of Plaintiff's simple battery conviction, this claim is barred by various estoppel doctrines, including the *Rooker-Feldman* doctrine, the *Heck* doctrine, and res judicata [ECF No. 102 p. 9].

### I.   Qualified Immunity

"To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004) (internal citation omitted). If so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002); *see also Moore v. Sheriff of Seminole County*, 748 F. App'x 229, 232 (11th Cir. 2018).

To overcome the qualified immunity defense, a plaintiff must demonstrate that the official deprived him of a constitutional right that was "clearly established" when the alleged offense occurred. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). This requirement "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 206. "Put another way, the defendant must have fair notice of his conduct's unconstitutionality which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) of

principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1350–52 (11th Cir. 2002)). For purposes of qualified immunity, only decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the Florida Supreme Court constitute "clearly established" law in this district. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007) ("We have held that decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law."). In sum, "[q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Hope v. Pelzer*, 536 U.S. 730, 752 (2002) (internal quotation marks omitted).

In deciding whether an act is part of an officer's discretionary function, courts ask whether the act falls within the officer's general job duties. *See Hollomon ex rel. Hollomon v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) ("Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities.").

In this case, there is no dispute among the parties that the Defendant Officers were performing a job-related function and acting in their discretionary authority during the October 22, 2016 incident [ECF No. 139 p. 5 ("Lucibella does not dispute that Defendants acted in a discretionary capacity . . . ."); ECF No. 147 p. 4 n.3]. The burden thus shifts to Plaintiff to show that qualified immunity does not apply. *See Lee*, 284 F.3d at 1194 (11th Cir. 2002); *Holloman*, 370 F.3d at 1264. To satisfy this burden, Plaintiff must "show (1) that [the officers] violated a constitutional right and (2) that the right was clearly established at the time of the alleged violation." *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019)

**A.      Unreasonable Search**

The Court first considers whether the Officers' warrantless entry onto the curtilage of Plaintiff's home without permission violated any "clearly established" right under the Fourth Amendment as alleged in Count VII.

The Fourth Amendment provides the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Under the Fourth Amendment, searches and seizures 'inside a home without a warrant are presumptively unreasonable.'" *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).  Moreover, warrantless searches of the curtilage of a home generally violate the Fourth Amendment's prohibition on unreasonable searches.  *See Collins v. Virginia*, 138 S. Ct. 1663, 1676 (2018).[3]  "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  For example, the presumption that warrantless searches are unreasonable can be overcome if the "exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978).  The most urgent of these exigencies is "the need to protect or preserve life" in an emergency situation.  *United States v. Holloway*, 290 F.3d 1331, 1335 (11th Cir. 2002).

For the emergency aid exception to apply, "officers must have an objectively reasonable belief that someone inside is 'seriously injured or threatened with such injury[]' and is in need of

---

[3] "Curtilage is an area near and closely associated with the home; at the founding, it was considered part of the house for Fourth Amendment purposes." *United States v. Bruce*, 977 F.3d 1112, 1121 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2541 (2021).  There is no dispute that the officers' search of Plaintiff's backyard constituted a search of the curtilage of his home within the ambit of Fourth Amendment protection [ECF No. 102 p. 13].

immediate aid." *United States v. Timmann*, 741 F.3d 1170, 1178 (11th Cir. 2013) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403–04 (2006)).  "Courts have held police officers' belief that someone inside a home needs immediate assistance objectively reasonable under various circumstances." *Id.* at 1179.  All of these cases "have in common the indicia of an urgent, ongoing emergency, in which officers have received emergency reports of an ongoing disturbance, arrived to find a chaotic scene, and observed violent behavior, or at least evidence of violent behavior." *Id.*  The government bears the burden of demonstrating that the exception applies. *Holloway*, 290 F.3d at 1337.  "The specific test is not whether the officer actually believed there was an emergency inside the house, but 'whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger.'" *United States v. Evans*, 958 F.3d 1102 (11th Cir. 2020) (quoting *Michigan v. Fisher*, 558 U.S. 45, 49 (2009)).  Thus, the narrow question is whether, looking at the entirety of the circumstances, a reasonable officer confronted with those circumstances could have objectively believed that an immediate search was necessary to safeguard potential victims. *See Evans*, 958 F.3d at 1106–07.

Defendants argue that the emergency aid exception should apply here based on the facts and circumstances that the Defendant Officers faced, including reports of gunshots in the area, neighborhood individuals directing Officer Ermeri in the direction of Plaintiff's home, along with Plaintiff's possession and concealment of a gun, the shell casings on the ground in Plaintiff's backyard, and Plaintiff's level of intoxication [ECF No. 102 p. 13].  Plaintiff argues in response that there was no emergency to justify the warrantless search, because "[w]hen the officers were at the gate, there was nothing indicating that anyone was endangered by Wohlfiel or Lucibella or in need of medical attention" [ECF No. 139 p. 12].  Plaintiff further argues that Ermeri's warrantless entry does not qualify for the emergency aid exception because Ermeri did not see the

gun until after he entered the property [ECF No. 139 p. 12].

Upon an exhaustive review, the Court determines that the full record, properly construed in a light most favorable to Plaintiff, does not support granting judgment as a matter of law on the basis that an ongoing emergency justified Officer's Ermeri's warrantless entry.  The 911 calls reporting gunshots did not specify that they came from Plaintiff's house or any other specific location, referencing instead a more generalized vicinity.  Although neighborhood individuals directed Officer Ermeri in the general direction of Plaintiff's residence, those neighbors also indicated that the shots could have come from other houses as well.  Then, when Officer Ermeri arrived at Plaintiff's back gate, he found Plaintiff and Wohlfiel sitting on the back patio.  There were minimal, if any, signs of chaos or violence, and there is a factual dispute as to whether Officer Ermeri saw the gun before or after entry [ECF No. 101-7 pp. 27:9–13, 84:23–85:4, 87:9–13].  According to Plaintiff's testimony, Ermeri was "30 feet in" before he even recognized Wohlfiel and before he noticed the gun, and at that point he called out to Plaintiff that he could see the gun [ECF No. 123-1 p. 166:1–9].  Officer Ermeri also acknowledges that he did not notice the shell casings on the ground until after entry [ECF No. 101-10 pp. 10:6–7, 13:4–5].  The emergency aid exception requires "indicia of an urgent, ongoing emergency" such as when "officers have received emergency reports of an ongoing disturbance, [and] arrived to find a chaotic scene, and observed violent behavior or at least evidence of violent behavior." *Timmann*, 741 F.3d at 1179.  Here, it is not clear for purposes of summary judgment that Officer Ermeri or the other officers encountered such circumstances prior to entering Plaintiff's property.

Defendants principally rely on *United States v. Holloway*, 290 F.3d 1331 (11th Cir. 2002), for their argument that the emergency aid exception applies.  In *Holloway*, however, officers responded to 911 calls reporting gunfire and arguing at a specific address, including a second 911

call reporting continued gunfire and arguing while the officers were en route. *Id.* at 1332. Upon arrival, the officers encountered what amounted to an apparent domestic situation—a couple on the front porch of their mobile home, with a woman who was nonresponsive to verbal commands and refused to raise her hands into view and a child who suddenly came out of the residence and was ordered back inside. *Id.* After the officers secured the couple, they surveyed the area around the mobile home and saw several beer cans, a shotgun with the safety disengaged, and several shotgun shells, some already expended. *Id.* at 1333. Only at that point did the officers search the mobile home for victims. *Id.* Although Defendants' reliance on *Holloway* is not misplaced, the Court finds the circumstances in that case to be sufficiently more elevated than the scenario confronting Officer Ermeri here.

Defendants also rely on similar cases, but those cases bear indicia of an urgent, ongoing emergency not found in the summary judgment record here. *See, e.g.*, *United States v. Evans*, 958 F.3d 1102, 1105 (11th Cir. 2020) (affirming denial of motion to suppress under emergency aid exception, where arriving police officers encountered an ongoing domestic situation and heard what sounded like a whimpering human); *United States v. Walton*, 323 F. App'x 837, 840 (11th Cir. 2009) (same, where officers received emergency call reporting multiple rounds of gunshots in apartment complex across the street from an elementary school, officers discovered on scene multiple impact holes from an AK-47 and empty casings on the ground, an individual involved in the shooting identified the defendant as the perpetrator who kept weapons in his apartment, and officers were faced with an apartment potentially full of an unknown number of armed individuals); *United States v. Huffman*, 461 F.3d 777, 784 (6th Cir. 2006) (same, where 911 caller reported gunshots at a specific residence with someone inside that might be harmed or killed, and where officers upon arrival discovered multiple bullet holes in the front windows of the home,

CASE NO. 20-82156-CIV-CANNON/Reinhart

shards of glass on the front porch, and bullet holes on the walls inside the house).

Alternatively, Defendant argues that any violation of the Fourth Amendment was not clearly established at the time of the incident [ECF No. 102 p. 13].  On this point, the Court determines that the summary judgment record does not permit a conclusion as a matter of law to that effect.  A violation of a constitutional right is clearly established if a reasonable official would understand that his conduct violates that right.  *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011); *see Moore v. Pederson*, 806 F.3d 1036, 1046 (11th Cir. 2015).  One way to determine if a violation of a constitutional right is clearly established is by looking at the officer's conduct to assess whether that conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent."   *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011).  It is well settled that an officer violates the Fourth Amendment by entering the curtilage of a home without a warrant, without consent, and without further justification under the Fourth Amendment.  *See Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008) (quoting *Payton v. New York*, 445 U.S. 573, 585–86 (1980)) ("Because 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,' it is 'a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'"); *see also Walters v. Freeman*, 572 F. App'x 723, 730 (11th Cir. 2014); *O'Kelley v. Craig*, 781 F. App'x 888, 898 (11th Cir. 2019).

In this case, viewing the evidence in the record in the light most favorable to Plaintiff— including the factual dispute as to whether Officer Ermeri saw Plaintiff's firearm before or after entering the property—there is a genuine dispute of fact as to whether Officer Emeri had an objectively reasonable basis to enter Plaintiff's curtilage without a warrant based on the emergency

17

aid exception.[4]   The Court therefore denies Defendants' motion for summary judgment on

qualified immunity grounds as to the § 1983 unreasonable search claim in Count VII.[5]

### B.    Excessive Force

The Court next addresses whether the Officers' use of force against Plaintiff violated a

"clearly established" right under the Fourth Amendment as alleged in Count II.

Where, as here, there is a "claim that law-enforcement officers used excessive force to

effect a seizure," the analysis "is governed by the Fourth Amendment's 'reasonableness'

standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014).   A court's determination of objective

reasonableness "requires a careful balancing of the nature and quality of the intrusion on the

---

[4] As a substantive matter under the Fourth Amendment, Defendants defend the legality of the entry only on the basis of the emergency aid exception.

[5] Defendants also contend incorrectly that Plaintiff's unreasonable search claim is "barred and precluded under the *Rooker-Feldman* doctrine, the *Heck* doctrine, and res judicata" [ECF No. 102 p. 9].   *Rooker-Feldman* doctrine does not apply, because Plaintiff does not challenge or seek reconsideration of his conviction or sentence.   *See Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005) (holding that the *Rooker-Feldman* doctrine is "confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.").   Nor does the holding of *Heck v. Humphrey*, 512 U.S. 477 (1994), preclude Count VII; the crime for which Plaintiff was convicted in state court, simple battery, does not require proof that the officer was lawfully executing a legal duty.   *See K.H. v. State*, 8 So. 3d 1155, 1156 (Fla. 3d Dist. App. 2009) (finding simple battery offense could proceed despite finding that the battered officer was not engaged in the lawful performance of his duties).   In other words, a potential finding that Defendant Officers' entry into Plaintiff's backyard was unlawful under the Fourth Amendment would not imply that Plaintiff's conviction was invalid.   Finally, neither res judicata nor collateral estoppel (construing Defendants' argument generously) applies here. Defendant Officers were not a party to Plaintiff's criminal case and are not in privity with the state of Florida.   *See Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1329 (11th Cir. 2003) ("Under Florida law, collateral estoppel applies if (1) an identical issue, (2) has been fully litigated, (3) *by the same parties or their privies*, and (4) a final decision has been rendered by a court of competent jurisdiction.") (emphasis added); *see also Farred v. Hicks*, 915 F.2d 1530, 1534 (11th Cir. 1990) ("[A]lthough [the plaintiff] was a party in the state criminal proceeding and is a party in this civil case, neither the police officers nor the [head of the police department] were parties to the criminal case.").

individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Conner*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). "Reasonableness in this context depends on all the circumstances relevant to an officer's decision to use force and the amount of force used." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015). This question must be considered "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Plumhoff*, 572 U.S. at 774 (internal quotation marks omitted). The reasonableness calculus therefore "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

The Fourth Amendment's "objective reasonableness" standard supplies the test to determine whether the use of force was excessive. *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009). The Eleventh Circuit has explained that the focus is on three factors:

> The analysis requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect] . . . actively resist[ed] arrest or attempt[ed] to evade arrest by flight.

*Penley v. Eslinger*, 605 F.3d 843, 849–50 (11th Cir. 2010) (internal quotations omitted). The Court must view the version of the facts in the light most favorable to the party asserting the injury, here Plaintiff Lucibella, in analyzing whether the facts alleged show the Officers' conduct violated a constitutional right. *Barbee v. Naphcare, Inc.*, 216 F. App'x 851, 852–53 (11th Cir. 2007) (internal quotation marks and citations omitted).

Accepting the facts in the light most favorable to Plaintiff, the Court declines to conclude as a matter of law that Defendants' use of force was objectively reasonable. First, construing the facts in Plaintiff's favor, Plaintiff did not pose an immediate threat to the safety of the officers or

others.  Plaintiff disputes that he grabbed Officer Ermeri by the back of the head prior to the take down.  According to Plaintiff, after he poked Officer Ermeri in his vest and told Officer Ermeri to "get your hands off me," Officer Ermeri paused momentarily, seemed unsure what to do, and only at that point initiated the take down despite no immediate physical contact from Plaintiff [ECF No. 123-1 p. 217:21–23].  Second, according to the Officers' testimony, Plaintiff resisted their attempts to put handcuffs on him by "struggling" and "stiffing his arm" [ECF No. 101-7 p. 52:9; ECF No. 123-4 p. 64:18–20].  But Plaintiff at least implicitly disputes this as well, noting that he was unconscious during this time [ECF No. 123-1 p. 218 ("I remember nothing else [after the take down] other than being back in that seat covered in blood.")].  Ceuleers averred in a sworn affidavit that, after the takedown, Plaintiff was "completely unresponsive" [ECF No. 106-11 p. 1].  And, Wohfiel testified that Plesnik's action to secure Plaintiff with her knee was "unnecessary because at that point Plaintiff wasn't moving" [ECF No. 101-9 p. 84:20–21].  In sum, viewing the record evidence in the light most favorable to Plaintiff, there are genuine issues of fact precluding summary judgment on Plaintiff's excessive force claim, including whether Plaintiff grabbed Officer Ermeri prior to being taken down, whether Officer Plesnik's action in securing Plaintiff with her knee applied her full weight to Plaintiff's back, and whether such action was reasonable under the circumstances.  Summary judgment on Defendants' qualified immunity grounds defense as to Count II is denied.

CASE NO. 20-82156-CIV-CANNON/Reinhart

**CONCLUSION**

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendants' Motion

for Summary Judgment [ECF No. 102] is **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 29th day of March

2022.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:      Counsel of Record

21